Norris (of Color) *vs.* Patton's Administrator.

APPEAL FROM KENTON CIRCUIT.

1. A slave residing in Covington, Ky., was sent for by his owner to come to Cincinnati, Ohio, where the owner made a parol contract with the slave, by which he was to have his freedom on the payment of a stipulated sum of money. Held—that by the act of the master inviting the slave to Cincinnati, Ohio, and there making such a contract with him, that the slave did not acquire a right to freedom.

2. A parol agreement between master and slave for the future emancipation of the slave cannot be specifically enforced by the slave; being a slave he can maintain no suit.

The appellant being the property of the appellee,   Case stated. a citizen of Virginia, was permitted, by his owner, to reside in Covington, Kentucky, for some years, paying the proceeds of his labor to his master, who, being on a visit to Cincinnati, Ohio, sent across the Ohio river a request that the appellant meet him at the house of C. A. Withers & Co., in Cincinnati, when he proposed to appellant that if he would give him $400 and pay it in five years that he might have his freedom, and that he would not sell him in the meantime. This proposition was at once agreed to by the appellant, and he immediately returned to Covington, in Kentucky. Before the expiration of the five years, and before the $400 was paid, John M. Patton, the owner of the appellant, sold him to James M. Patton, who dying, his representative came to Covington. The appellant, apprehending that he would be removed, brought this suit to enjoin his removal, asserting right to freedom and praying that his right might be established under the contract. A demurrer was filed to the petition, which was overruled; an answer filed denying any knowledge of the contract, and its binding effect if ever made. The Circuit Court dismissed the petition of the appellant, and he has appealed to this court.

*J. W. Stevenson*, for appellant—

1. The court below assumed that the fact of the agreement between the appellant and John M. Patton taking place in Ohio is entitled to no weight, and cannot affect the contract. Can this position be maintained? We suppose it cannot. We admit that it has been judicially settled that a slave sent or permitted to go where slavery does not exist and is not tolerated, for a temporary purpose only, does not thereby acquire a right to freedom; and that on the return of the slave to Kentucky from such temporary visit, his condition would not be changed. (*Rankin vs. Lydia*, 2 *Marshall*, 476; *Bush's Rep's. vs. White*, 3 *Monroe*, 104; *Graham vs. Strader*, 5 *B. Monroe*, 179; *Tom Davis vs. Tingle*, 8 *B. Monroe*, 546; *Collins vs. America*, 9 *Ib.* 565; *Maria vs. Kirby*, 12 *Ib.* 542.)

But we deny that the principle settled in any of these cases is antagonistic to the propositions for which we contend. We maintain that as to acts done, rights acquired, and contracts made in other countries, touching property therein, the law of the country where the acts are done, the rights acquired or the contracts made, will generally govern, in respect to the capacity, state, or condition of the persons. In affirmance of this doctrine, the Supreme Court of Louisiana expressly held "that they had no difficulty in assenting to the proposition that contracts entered into in other States, as it relates to their validity, and the capacity of the parties, are to be tested by the *lex loci contractus;* and that if a contract was entered into in another State, in conformity to the local law, to have its effect and execution here, the courts of Louisiana cannot declare it a nullity, on the ground that it would not be valid according to the system or jurisprudence of that State, even if both of the contracting parties were not citizens of such foreign State." (*Andrews vs. his creditors*, 11 *La. Rep.* 464.) So also in *Lunsford vs. Cognellan*, 14 *Martin's La. Rep.* 405, it was held that if a person going from Kentucky to Ohio to reside for

ever so short a time, his slaves coming to Louisiana would be free. And so, too, persons bound by particular contracts, which restrain their liberty, lose that character and condition, and become free, even though they return to their original servitude and obligations upon coming back to the country they had left. (*Story's Conflict of Laws*, sec. 96, and the notes there cited.)

We admit that the domestic slave may be sent for temporary purposes to a free State, and he may accompany his master or mistress temporarily to a free State, and after returning with them to a slave State have their original status of servitude imposed on him; but we deny that any case can be found where a master sends for a slave to a free State, and there, under the operation of the laws of a free State, contracts with him as a free man—which laws sanction such contract—that it is invalid. The master, with full knowledge of the right of the slave to contract in Ohio, chooses to send for him and enter into a contract there. Upon what right can he claim to be relieved from the general operation and binding efficacy of the *lex loci contractus?* He cannot plead the laws of Kentucky or Virginia, rendering all contracts with slaves invalid, because he has chosen to put himself beyond the territorial operation of the statutes of either of those States. He has chosen to go beyond the point of their efficacy, as he had the right to do. Why, if, with full knowledge of the binding force of the Ohio statutes upholding such a contract, he chooses to enter into it, shall he not be bound by it? There are considerations of policy inhibiting such contracts between master and slave in Kentucky, applicable to such a contract—for the very reason that Patton's course showed his determination to put himself beyond Kentucky or Virginia law. Such was virtually the principle recognized in the case of *Ferry vs. Street*, 14 *B. Monroe*, 360–1.

2. We maintain secondly that Patton's sending for the appellant, releasing his control over him in Ohio

NORRIS
(OF COLOR)
*vs.*
PATTON'S ADM'R

—permitting him to go and remain as long as he pleased, is a virtual emancipation of him, and should be so held.

This court has held that the owner of a slave who permitted him to go to Ohio, and there to remain for a long period, free from his control, and made declarations that he intended him to be free, were such acts on the part of the owner as indicated a clear intention that the slave was to be free, and the court held him free. (*Ben. vs Gilman,* 11 *B. Monroe,* 211.)

Now we submit that the facts of this case are much more strongly indicative of an intention to free the appellant than the circumstances which marked that case. Here, the owner sent for the appellant to come upon free soil, under the sanction of Ohio law, and gives him his freedom. He ceases to receive his hire, left him in Ohio, and he never did return to his master's service, nor was he ever again under Patton's control. It is true that appellant returned to Kentucky, but not by Patton's consent. He returned without his knowledge. By Patton's knowledge and permission he had a right to remain in Ohio; and Patton's acts show that he even ceased to control his hire; besides the admissions show that appellant went to Ohio whenever he pleased. Patton should not now ask the aid of Kentucky policy or Kentucky law to protect him in the commission of a mighty wrong on a faithful domestic, when under Ohio law he chose to set him free and take the hard earnings of the poor slave as a *quid pro quo* for his emancipation. The law of the place chosen by the master should be applied, whatever the subsequent status of the slave. The acts of Patton in Ohio was a renunciation of all claim to the appellant, and he should be estopped to deny them. No man should be tolerated in an attempt to outrage humanity.

A reversal is respectfully asked.

*W. B. Kinkead,* on the same side—

Argued, in addition to what was before said, that the conduct of Patton in inviting the appellant to Ohio, a free State, and there contracting with him as a free man, and treating him as such, was a clear proof of the appellant's right to be free, and of Patton's consent that he should be free. (Cited *Collins vs. America,* 9 *B. Monroe,* 546.)

*Menzies & Spillman,* for appellee—

In this case three questions are presented: 1. Is an executory contract made between a master and his slave, for the freedom of the slave, valid? 2. Is a parol executory contract between master and his slave valid and enforceable? 3. Does the fact that such a contract was made in the State of Ohio give it force and validity which it would not have if made in the State of Kentucky?

1. A negative answer to the first proposition is clearly established by the decisions of this court in the cases of *Willis vs. Bruce & Warfield,* 8 *B. Monroe,* 550, and *Cook vs. Cook,* 3 *Littell,* 239. Such contracts as that relied upon in this case between master and slave are held to be invalid, and not enforceable.

2. A parol contract between a master and his slave cannot be enforced. The court is referred to the statute of Kentucky of 1800, (*Stat. Laws,* 609,) and the expositions of it in the case of *Willis vs. Bruce & Warfield,* 8 *B. Monroe, supra,* and *Major (of color) vs. Winn,* 13 *B. Monroe,* 251.

3. The third question involves two propositions: 1. Whether the appellant became free by the mere act of being summoned by his master, and in obedience to that summons going into the State of Ohio, upon the soil of a non-slaveholding State, for the temporary purpose of an interview with his master? 2. If not, would the parol executory contract made in the State of Ohio be more effectual than if made in Kentucky, in a suit brought in Kentucky for its enforcement?

The first branch of the proposition has been so frequently and conclusively settled in the negative by adjudications in this court, that it is unnecessary to discuss it. Among the many cases in which this question has been discussed, we refer to the following : *Rankin vs. Lydia,* 2 *Monroe,* 476 ; *Graham vs. Strader,* 5 *B. Monroe,* 179 ; *Collins vs. America,* 9 *Ib.* 572 ; *Maria vs. Kirby,* 12 *Ib.* 545. So far as we know, this court has never been called on to adjudicate upon a case where it was claimed that a contract stipulating for the emancipation of a slave was made in free territory ; but if it be claimed that the slave would gain any advantage by this circumstance, it must be on the alleged ground that the local law, not recognizing or tolerating slavery, would treat the slave as a free man, recognize him as a party competent to contract, and the contract once having taken effect, by virtue of the local law, would be valid for all time, and in all places, between the parties.

Let us inquire what would necessarily be implied by this position. It is not to be presumed that the law of Ohio would differ from that of Kentucky as to the competency of a slave to contract, provided he be admitted to be a slave ; and the reason why any difference would be made is because in the one case he would be regarded and treated as a slave, and in the other he would be regarded and treated as a freeman. But make the laws of both States understand the facts alike, and the presumption is that they would decide alike. Let the law of Ohio regard the man as a slave in a given state of case, and doubtless it would say he was incompetent to contract. Place the same man in a position that the laws of Kentucky would regard him as a freeman, and he would be recognized as competent to contract. Now it is contended that the laws of Ohio would regard and treat a man in the condition of the appellant when he made the contract, as a freeman, and would enforce the contract, and therefore as a matter of

comity the courts of Kentucky should recognize and enforce it.   But the question occurs, would the laws of Kentucky agree with those of Ohio in the fact of freedom and competency to contract?   This question is easily answered in the negative.   The appellant had gone to Ohio at the bidding of his master.   The very act of going being an act of obedience and subjection to authority for a temporary purpose, which being accomplished he returned to Kentucky, having laid no claim to his freedom while on free soil, and under laws that did not recognize slavery, and he continued to acknowledge himself a slave, paying over a part of the purchase money stipulated as the price of his freedom.   We come then to the conclusion, that if the law of Ohio would pronounce the contract with appellant a valid one, it is because it would pronounce him a freeman at the time the contract was made; but the laws of Kentucky not recognizing him as a freeman, but as a slave, cannot but treat this contract as other contracts made with slaves—against the policy of the law and void.

It is contended for appellant that the comity between the States requires that the courts of Kentucky should construe this contract, made in Ohio, as the courts of Ohio would do.   We have only to say that to refuse to do so is in perfect analogy with the adjudications of this court upon another aspect of this question.

By virtue of the ordinance of 1787, and the local laws of some of the neighboring States, slavery is entirely inhibited; and therefore whenever any individual comes upon their soil, otherwise than as a fugitive, the local law pronounces him a freeman, and their courts, when appealed to on the subject, so construe it.   But in cases where the slave goes only for some temporary purpose, our courts refuse to recognize this as a legitimate effect of the local law. The courts of one State declare that the local law annihilates the relation of master and slave; the other denies that it has any legitimate power over

this relation in cases of temporary sojourn. Now if our courts may disregard the local law, and the adjudications of the local courts on the question of the destruction of the very existence of slavery in a given case by virtue of the local law, as they have done in the cases above referred to of *Collins vs. America* and *Graham vs. Strader*, and the cases there cited, may they not do so in a matter which is merely incidental to the main question, viz: the capacity to contract or the validity of an agreement and under particular circumstances? A difference with regard to all the incidents is the necessary result of a difference on the main question. Since then our courts have so definitely decided that the slave continues to be a slave while on free soil for a temporary purpose only, the conclusion that he is as incapable of contracting then as when on slave territory, seems necessarily to follow. We perceive no ground for a reversal of the judgment.

June 16.

Chief Justice MARSHALL delivered the opinion of the Court—

Neither the terms of the agreement between Patton and his slave Norris, nor anything which occurred between them in reference to it, indicate the intention on either side that Norris should be free except on performance of the conditions provided for in the agreement itself. Nor is there any circumstance in the case which demonstrates the intention that Norris should, or the consent that he might become a permanent resident of Ohio, or that he would or might be there for any but a temporary purpose, and indeed for a momentary period. And there is nothing which shows that by the consent of his owner he either was or was not to be permanently subject to the laws of Ohio, or entitled to any privilege which those laws communicate. He was never treated by his owner otherwise than as a slave, except so far as the mere fact of making an agreement with him might imply the contrary; and as the agreement it-

self treats him as a slave, so to remain until a future time, when, if he should have performed certain conditions, he was to be free, it seems impossible to imply present freedom from the mere fact of making such an agreement, either in Ohio or elsewhere.

According to the principles heretofore maintaned by this court, Norris was not free merely because he was temporarily in Ohio by the act or consent of his owner, even if he was there for the purpose of making this agreement with him. According to the principles also maintained here, and deemed essential, the agreement with him was unobligatory, and he could not sue upon it, because he was a slave. And, moreover, it could not effect his emancipation here, because it was in parol. As to its construction there could be no difference whether made in Ohio or made in this State. And as to its effect we can perceive no ground of difference, unless upon the assumption that Norris was free before the agreement was made, because he was in Ohio by the act or consent of his owner before and when the agreement was made, and perhaps for the purpose of making it. The propriety of this assumption we are bound by our own opinions, as well as by a regard for the adjudications of this court, and for the policy of the State, and the rights and interests of its citizens, to deny. And we do not admit it, but assume the contrary.

Under these opinions we are constrained to adopt the conclusion that the petition, whether for the assertion of present freedom or for the specific enforcement of this parol executory agreement for the future and conditional freedom of Norris, though made in Ohio, cannot be maintained in our courts. Norris, even if he might have been regarded as free if the condition on which he was to be free had been performed in Ohio, cannot be so regarded here when the conditions have not been performed. And who, being a slave, cannot maintain a suit in our courts.

Wherefore, the judgment is affirmed.

---

NORRIS
(OF COLOR)
vs.
PATTON'S ADM'R

1. A slave residing in Covington, Ky., was sent for by his owner to come to Cincinnati, Ohio, where the owner made a parol contract with the slave, by which he was to have his freedom on the payment of a stipulated sum of money. Held— that by the act of the master inviting the slave to Cincinnati, Ohio, and there making such a contract with him, that the slave did not acquire a right to freedom.

2. A parol agreement between master and slave for the future emancipation of the slave cannot be specifically enforced by the slave; being a slave he can maintain no suit.